1  LAYLA MEDINA
   Nevada State Bar No. 14740
2  309 S. Third St. #226
   Las Vegas, Nevada 89155-2610
3  (702) 455-0926
   Layla.Medina@clarkcountynv.gov
4
   Attorney for Amicus Curiae NACJ
5
                UNITED STATES DISTRICT COURT
6                   DISTRICT OF NEVADA

7  United States of America,        Case No. 25-cr-227-JAD-BNW

8           Plaintiff,              **AMICUS BRIEF OF NEVADA
                                    ATTORNEYS FOR CRIMINAL
9       v.                          JUSTICE IN SUPPORT OF
                                    MOTION TO DISMISS
10  Giann Icob Salazar Del Real,    INDICTMENT OR DISQUALIFY
                                    U.S. ATTORNEY'S OFFICE**
11          Defendant.

**Interest of Amicus Curiae**

Nevada Attorneys for Criminal Justice (NACJ) is a statewide organization of criminal-defense practitioners who appear in this District daily. NACJ's interest is institutional: ensuring that Congress's statutory framework governing who may serve as United States Attorney is followed so charging decisions, plea bargaining, trials, and appeals proceed under lawful, predictable authority that commands public confidence and honors separation-of-powers principles.

**Introduction**

Trials decide guilt; statutes decide who gets to accuse. This case is about the latter—who may lawfully wield the sovereign's charging power as "United States Attorney."

Congress answered that in a deliberately bilateral and time-restricted scheme. For permanence, the Appointments Clause model governs: presidential nomination with Senate consent (a "PAS" appointment) under 28 U.S.C. § 541. For continuity, Congress allowed only a short bridge: the Attorney General may name an interim for 120 days; if the vacancy persists, the district court—not the Executive—may appoint a stopgap "until the vacancy is filled," i.e., until a PAS U.S. Attorney qualifies, § 546(c)–(d). And to foreclose end-runs, the Federal Vacancies Reform Act ("FVRA") supplies the exclusive acting-service channels and bars reliance on generic DOJ delegation statutes. When those limits are ignored, the office remains vacant and unauthorized acts "have no force or effect." Taken together, the statutes

1

separate and distribute appointment power across branches to ensure accountability in federal prosecutions. Unilateral Executive installation—by delegation, title-swapping, or FVRA gamesmanship—defies that design and the separation-of-powers principles it embodies.

Complying with the statutory structure matters because prosecutorial legitimacy turns on the lawful source of a prosecutor's authority and on the public's perception that prosecutions are undertaken by officers installed through the rules Congress wrote. Installing a U.S. Attorney in violation of those rules erodes public trust in federal prosecutions, undermines the presumption of regularity, and invites doubts about neutrality—harms the Supreme Court has warned against when tying prosecutorial authority to public confidence in justice being done.

And the practical fallout is concrete and District-wide. Grand jury practice depends on a lawful "attorney for the government;" plea bargaining—how nearly all cases resolve—depends on stable, lawful authority; and certain government appeals hinge on a certification "by the United States attorney." Structural appointment defects inject uncertainty into indictments and pleas, jeopardize interlocutory-appeal certifications, and slow criminal dockets to a crawl. And none of these threshold structural issues are resolved by the de-facto-officer doctrine.

All of these harms—betraying Congress's intent, subverting trust in federal prosecutions and day-to-day prosecutorial function, sowing District-

wide uncertainty and confusion—are as predictable as they are avoidable if the Court simply enforces the law.

**I.    Congress designed a bilateral—and time-restricted—appointments scheme for U.S. Attorneys; unilateral Executive installation defies that design and the separation of powers**

Upon Article II of the Constitution, Congress built a bilateral, time-restricted appointment scheme for U.S. Attorneys that intentionally distributes appointment power and separates it between branches. For permanent tenure, Congress preserved the Appointments Clause default—Presidentially appointed, Senate-confirmed ("PAS") officers—via 28 U.S.C. § 541. For continuity, Congress allowed a short interim bridge (28 U.S.C. § 546) capped at 120 days, after which the district court (not the Attorney General) "may appoint" a temporary U.S. Attorney until a PAS U.S. Attorney qualifies. And to prevent end-runs, the FVRA makes its acting-service channels exclusive and bars reliance on DOJ's general delegation statutes to recreate a vacant PAS office. If those limits aren't honored, the office remains vacant and unauthorized acts "have no force or effect."

Read together, this framework of interlocking statutes reifies separation-of-powers by preserving the Senate's checking role and ensuring accountable, lawful prosecution leadership. Unilateral Executive installation—by delegation, title-swapping, or FVRA gamesmanship—defies both Congress's design and the separation-of-powers principles it embodies.

## A.    The default (Presidential nomination plus Senate consent) provides a critical structural safeguard

Article II of the Constitution (the "Appointments Clause") requires that the President obtain "the Advice and Consent of the Senate" before appointing "Officers of the United States."[1] The Appointments Clause's default "PAS" model deliberately combines a single decision-maker with a legislative check: the President nominates, the Senate consents. "The structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic."[2] Indeed, Alexander Hamilton described the Senate's role in the process as "an excellent check upon a spirit of favoritism in the President," guarding against nominees chosen solely because they are "personally allied to him" or possess "the necessary insignificance and pliancy to render them the obsequious instruments of his pleasure."[3]

The Supreme Court has likewise explained that the "Senate's advice and consent power is a critical structural safeguard [ ] of the constitutional scheme[,]"[4] pointing out, "The Framers envisioned it as an excellent check upon a spirit of favoritism in the President" and a guard against 'the

---

[1] U.S. Const. art. II, § 2, cl. 2.

[2] *Freytag v. Comm'r*, 501 U.S. 868, 888 (1991).

[3] *The Federalist No. 76*, at 406–07 (Alexander Hamilton) (Sweet Water Press ed., 2017).

[4] *NLRB v. SW General, Inc.*, 580 U.S. 288, 293 (2017) (cleaned up).

appointment of unfit characters ... from family connection, from personal attachment, or from a view to popularity."[5] The PAS-default embodied in 28 U.S.C. § 541 is therefore more than a procedure—it is a load-bearing safeguard that protects Founding-era separation-of-power principles.

### B. Continuity is permitted, but only as a bridge back to PAS

Section 546 allows the Attorney General to name an *interim* U.S. Attorney,[6] but only for 120 days or until a Senate-confirmed successor qualifies.[7] If time expires, the district court "may appoint" a stopgap "until the vacancy is filled[;]"[8] that is, until a § 541 appointee is confirmed. Congress thus provided for § 546 interim U.S. Attorneys—not to allow courts or the Executive (through the Attorney General) to entrench its preferred appointee—but for continuity, in essence creating a sustainable holding pattern while the constitutional (§ 541) order is restored in the form of a PAS officer.

---

[5] *Id.*

[6] 28 U.S.C. § 546(a).

[7] *See* 28 U.S.C. § 546(c)(1)–(2).

[8] 28 U.S.C. § 546(d).

### C.  The FVRA supplies narrow, temporary acting authority and anti-evasion rules

The FVRA[9] defines who may act and for how long—and then makes its channels exclusive *unless* (as here) a specific office-specific statute applies.[10] It also forbids relying on general vesting/delegation statutes.[11] Violating these rules has consequences: "the office shall remain vacant," only the department head may perform exclusive, nondelegable duties, and actions taken by an unauthorized "acting" official have "no force or effect" and "may not be ratified."[12]

### D.  Read together, these provisions reflect Congress's desire to separate and distribute the power to appoint U.S. Attorneys

Taken together, § 541 cements bilateral appointment for permanence—the President proposes and the Senate consents—while § 546(d) supplies a judicial backstop for continuity when the Executive's 120-day interim window lapses, underscoring Congress's insistence on returning to a PAS U.S. Attorney rather than entrenching an Executive pick. And § 3347(b) adds the textual brakes against end-runs by forbidding reliance on general DOJ delegation statutes (§§ 509, 510, 515, 519) to install an "acting" U.S. Attorney

---

[9] 5 U.S.C. § 3345(a)(1)–(3).

[10] 5 U.S.C. § 3347(a)–(b).

[11] *See id.*

[12] 5 U.S.C. § 3348(b), (d)(1)–(2).

outside the FVRA or § 546. Read as a whole, the scheme is a deliberately designed structural settlement that balances efficiency and continuity with accountability and in doing so preserves appropriately separated powers.

### E.    Congress has rightly protected its appointment role

From the country's founding, PAS is the default for principal officers—a structural choice the Framers praised as a guard against favoritism and pliant appointees.[13] When vacancies inevitably arise, Congress has provided narrow, temporary acting authority and then made those channels exclusive in the FVRA—precisely to protect the Senate's advice-and-consent function and to block DOJ's past efforts to bypass the Vacancies Act via general delegation statutes.[14]

When the Senate's role was threatened in 2006 by a temporary expansion of an interim U.S. Attorney provision, Congress corrected its course by passing the Preserving United States Attorney Independence Act of

---

[13] *See* U.S. Const. art. II, § 2, cl. 2; Alexander Hamilton, *The Federalist No. 76*, at 405–07 (Sweet Water Press ed., 2017) (Senate's "check upon a spirit of favoritism," avoiding nominees "personally allied" or sufficiently "pliant") (cleaned up).

[14] *See* 5 U.S.C. §§ 3345–3348; S. Rep. No. 105-250, at 12–15, 31 (1998) (FVRA provides "an exclusive set of procedures" and rejects indefinite delegation-based acting service); *NLRB v. SW General, Inc.*, 580 U.S. 288, 293–95 (2017) (FVRA enacted in response to "a threat to the Senate's advice and consent power").

2007—restoring a 120-day limit and a judicial backstop to ensure a prompt return to (Founding-era) PAS appointment.[15]

Those measures—PAS as the permanent rule, FVRA exclusivity as the anti-evasion brake, and § 546's 120-day limit plus court appointment as the continuity bridge—solidify and preserve the Senate's role in the appointment process and thus evidence Congress's consistent judgment that the country is best served by separating and distributing appointment power—not concentrating it in the Executive.

### F.  Unilateral Executive appointment violates both the statutory design and separation-of-powers ideals

Attempts to install or perpetuate leadership unilaterally by stitching together general DOJ vesting/delegation provisions[16] with "acting" labels runs head-on into the FVRA's exclusivity rule, which makes §§ 3345 and 3346 the *exclusive* routes for acting service and expressly forbids using general delegation statutes to perform a vacant PAS office's "functions and duties."[17] Relatedly, the FVRA limits acting service by nominees,[18] and courts

---

[15] *See* Preserving United States Attorney Independence Act of 2007, Pub. L. No. 110-34, 121 Stat. 224; H.R. Rep. No. 110-58, at 2–4 (2007); 153 Cong. Rec. S1993-01 (daily ed. Feb. 15, 2007) (Sen. Leahy); 153 Cong. Rec. H5553-01 (daily ed. May 22, 2007) (statements of Reps. Sanchez, Jackson-Lee) (targeting indefinite "interim" end-runs and preserving the Senate's role).

[16] 28 U.S.C. §§ 509, 510, 515, 519.

[17] 5 U.S.C. § 3347(a)–(b).

[18] 5 U.S.C. § 3345(b)(1).

have rejected "post-vacancy first assistant" maneuvers that would let agencies manufacture FVRA eligibility after the fact.[19]

The FVRA's provisions, and courts' interpretations of them, protect against misuse in service of evading the *bilateral* system for appointing U.S. Attorneys that Congress created to preserve separation of power in the appointment process. Therefore, unilateral Executive installation of a U.S. Attorney through statutory sleight of hand—by delegation, title-swapping, or FVRA gamesmanship—violates the plain language and intent of the controlling statutes and the separation-of-powers principles it implements.

## II. An unlawfully appointed U.S. Attorney degrades public trust and confidence

Federal prosecutions draw legitimacy not only from verdicts but from the *source* of the prosecutor's authority. Congress embedded that legitimacy in the PAS appointment scheme for U.S. Attorneys that produces a two-branch (Executive-Senate) clap of approval for appointees. A unilateral installation by the Executive essentially carries the force and confidence of one hand clapping—it erodes public trust, invites skepticism about neutrality, and undermines the presumption of regularity.

The Supreme Court has explicitly tied prosecutorial authority to public trust. In *Berger*, the Court described the U.S. Attorney as "the representative … of a sovereignty … whose interest … is not that it shall win a case, but

---

[19] *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 28–29 (D.D.C. 2020).

that justice shall be done," warning that juries credit prosecutors because they expect those obligations to be honored.[20] And in *Kyles v. Whitley* the court explained that prosecutorial disclosure of exculpatory evidence "serve[s] to justify *trust* in the prosecutor as the representative of a sovereignty … whose interest … is … that justice shall be done."[21] Again with an eye towards public trust and integrity, the Ninth Circuit has noted that prosecutorial misconduct is so troubling because "lawyers representing the government in criminal cases serve truth and justice first. The prosecutor's job isn't just to win, but to win fairly, staying well within the rules."[22]

Public trust in prosecutors isn't limited to actions—appearance matters too. An interested prosecutor, the Supreme Court explained, "diminishes faith in the fairness of the criminal justice system in general."[23]  Whether prejudice results is beside the point, "for what is at stake is the public *perception* of the integrity of our criminal justice system. [J]ustice must satisfy the *appearance* of justice[.]"[24]

---

[20] 295 U.S. 78, 88 (1935).

[21] 514 U.S. 419, 439–40 (1995) (emphasis added).

[22] *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993).

[23] *Young v. United States ex rel. Vuitton*, 481 U.S. 787, 811 (1987).

[24] *Id.* (cleaned up; alteration original; emphasis added).

10

Requiring prosecutors to act, and appear, trustworthy and disinterested also provides structural safeguards and a legitimizing presumption of regularity. The government's charging and trial decisions rest on a "presumption of regularity" that holds only absent "clear evidence to the contrary."[25]  The Supreme Court has warned that any scheme "injecting a personal interest, financial or otherwise, into the enforcement process" risks bringing impermissible factors to bear and "in some contexts rais[ing] serious constitutional questions."[26]

Prosecutorial integrity, and the legitimacy that follows, becomes suspect when a U.S. Attorney is appointed unlawfully. The inaugural illegality degrades the very predicates that make federal prosecutions credible. It collapses the presumption of regularity by casting doubt on whether a lawfully designated officer is exercising the People's power. It creates the appearance-of-partiality harm the Supreme Court's *Young (Vuitton)* decision condemns. And it contradicts the rule-abiding that *Kojayan* requires.

More simply—at the most basic level public trust in the legitimacy of federal criminal prosecutions begins with federal prosecutors who act, and appear, as though they are seeking justice by enforcing federal laws fairly and consistently. When any federal prosecutor—let alone a U.S. Attorney—

---

[25] *United States v. Armstrong*, 517 U.S. 456, 464–65 (1996).

[26] *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249–50 (1980).

assumes power by disobeying the law—the very statutes that govern appointment, no less—"justice" cannot credibly follow. Indeed, the notion that "justice shall be done" by an unlawfully appointed U.S. Attorney is a performative contradiction. Pretending otherwise degrades the public trust, delegitimizes prosecutorial authority, and weakens any judicial system that tolerates it.

And the stakes are not academic or abstract. As (then-Attorney General, later Justice) Robert Jackson observed, "the prosecutor has more control over life, liberty, and reputation than any other person in America," which is precisely why the public must *see* that power exercised with visible restraint—and from a lawful claim to office.[27] Endorsing prosecutions launched by an extra-statutory appointee sends the opposite message: that the government may break the rules to enforce them. The Supreme Court's trust-protective doctrines exist specifically to prevent that erosion of public trust and confidence in federal prosecutions.

**III.    An unlawfully appointed U.S. Attorney causes concrete, district-wide harms**

Congress vested charging and supervision of federal prosecutions in a lawfully appointed United States attorney.[28] Unlawful appointments cause concrete harms that are structural and ripple throughout the district. Day-to-

---

[27] Robert H. Jackson, *The Federal Prosecutor*, 24 J. Am. Judicature Soc'y 18 (1940).
[28] 28 U.S.C. § 547(1).

day grand-jury practice, plea bargaining (where almost all cases resolve), and statutory certifications for interlocutory government appeals all depend on a valid officeholder. Yet there's strong evidence that virtually every action taken under the direction of an unlawfully appointed U.S. Attorney is void.

The Supreme Court's NLRB cases make this point explicitly in the administrative context: When appointment/quorum rules are violated, official acts aren't ratified simply because undoing them is inconvenient. On the contrary, in *NLRB v. Noel Canning*,[29] for example, the Supreme Court invalidated *all* actions and decisions by the Board dating back to the Board's invalid recess appointments. And even short of sweeping retroactive invalidation, an unlawful U.S. Attorney disrupts and compromises several aspects of prosecutor's day-to-day work in the affected district.

### A. Charging and grand-jury integrity depend on a lawful "attorney for the government"

The U.S. Attorney plays a central role in grand jury proceedings. The grand jury interfaces constantly with "attorneys for the government"— including the U.S. Attorney and AUSAs—who are authorized and directed by the Federal Rules of Criminal procedure to: (1) be present during sessions, (2) administer secrecy/disclosure rules, and (3) sign indictments.[30] DOJ policy

---

[29] 573 U.S. 513 (2014).

[30] Fed. R. Crim. P. 6(d) (Who may be present), 6(e) (Disclosures), and 7(c) (Signing indictments) (1); see also Fed. R. Crim. P. 1(b)(1) (defining "Attorney for the government").

likewise places charging and grand-jury presentation under the U.S. Attorney's supervision.[31]

Given the grand jury's "operational separateness from its constituting court,"[32] those prosecutorial activities are not subject to prospective judicial supervision. The absence of court supervision makes it even more important that prosecutorial grand jury responsibilities are carried out by a lawfully appointed U.S. Attorney or subordinate. And as a practical matter, the grand jury serves no meaningful purpose without a lawful "attorney for the government" to be present and participate, enforce secrecy and disclosure rules, and sign/authorize indictments.

Meanwhile, the alternative—the participation of an unlawfully appointed U.S. Attorney—comes with serious and obvious risks. Errors in grand jury proceedings, which arguably extend to unauthorized presence, can warrant dismissal if they "substantially influence[] the grand jury's decision to indict" or create "grave doubt" it did not.[33] Separately, there are structural issues akin to the Supreme Court's NLRB cases: just as a Board without a lawful quorum cannot exercise its powers,[34] a U.S. Attorney

---

[31] *See* Justice Manual 9-2.030, 9-11.000.

[32] *United States v. Williams*, 504 U.S. 36, 49 (1992).

[33] *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (prosecutorial misconduct and irregularities in grand jury proceedings).

[34] *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 687–88 (2010).

who lacks lawful appointment cannot lawfully perform non-delegable grand jury functions tied to that office.

### B.    Plea bargaining depends on stable, lawful authority—and instability skews advice and enforceability

Plea negotiations are a "critical phase of litigation" protected by the Sixth Amendment.[35] In any given year, 98% of federal criminal cases end with a plea agreement.[36] But since plea agreements are essentially contracts,[37] the fact that one contracting party lacks legal authority creates two district-level problems:

First, it distorts the advice defendants receive and the decisions they make about plea offers. Counsel must advise defendants of the likelihood that an unlawfully appointed U.S. Attorney not only lacks legal authority to bring charges but likewise lacks authority to resolve those charges with an enforceable plea agreement. The resulting uncertainty means a defendant must choose between either challenging an arguably defective indictment—

---

[35] *Missouri v. Frye*, 566 U.S. 134, 144 (2012); *Lafler v. Cooper*, 566 U.S. 156, 170–71 (2012).

[36] *See* Carrie Johnson, *The Vast Majority of Criminal Cases End in Plea Bargains, a New Report Finds*, NPR (Feb. 22, 2023), https://www.npr.org/2023/02/22/1158356619/plea-bargains-criminal-cases-justice (citing Am. Bar Ass'n, Crim. Just. Section, Plea Bargain Task Force Report (2023), https://www.americanbar.org/content/dam/aba/administrative/criminal_justice/reports/plea-bargain-tf-report.pdf); *see also Frye*, 566 U.S. at 143 ("Ninety-seven percent of federal convictions … are the result of guilty pleas.")

[37] *See Puckett v. United States*, 556 U.S. 129, 137-38 (2009).

and foregoing a favorable plea offer[38]—or accepting a favorable plea offer (that's arguably unenforceable)—despite a legally dubious indictment. Deciding whether to accept a plea offer always involves trade-offs, including foregoing potential challenges to an indictment—but injecting uncertainty about the government's authority to charge and capacity to enter a binding agreement needlessly complicates and slows the process by which virtually all federal criminal cases are resolved.

The second plea-related harm concerns defendants who do choose to enter plea agreements. For them, the capacity issue invites follow-on litigation. As a result, plea agreements become a much less effective tool for fully and finally resolving criminal cases. In effect, they become more like non-binding memorandums of understanding than enforceable contracts. In the process, plea agreements become a much less effective mechanism for resolving criminal cases.

### C. Government appeals conditioned on a "United States attorney" certification are jeopardized

Under 18 U.S.C. 3731, certain criminal interlocutory appeals require a certification "by the United States attorney ...."[39] The Ninth Circuit has

---

[38] In *theory*, the government might allow a defendant to enter a plea agreement while reserving the right to challenge the U.S. Attorney's authority, but the government rarely, if ever, allows such reservation-of-rights in plea agreements in this District. And, in fairness, not without good reason since a plea agreement's value is largely in fully and finally resolving a case.

[39] 18 U.S.C. § 3731.

explained that this certification—which "establish[es] … jurisdictional preconditions[]"[40]—must be provided "by a United States Attorney (*personally*, not by an Assistant United States Attorney) …."[41]

If the "United States attorney" is unlawfully serving, every such certification, and the government's corresponding right to interlocutory appeal, is compromised. And § 3731's plain text cannot be worked around by using a § 515 "special attorney" or 28 U.S.C. §§ 509–10 delegation theories because the FVRA expressly forecloses using general delegation to perform the functions and duties of a vacant PAS office.[42] The government's right to interlocutory appeal is therefore one more casualty of an unlawful U.S. Attorney.

### D. Unlawful leadership predictably breeds delay that burdens defendants, witnesses, victims, and the Court

The Speedy Trial Act requires cases to move expeditiously.[43] As this case illustrates, structural appointment defects precipitate threshold fights—disqualification, motion practice over indictments and certifications, and ratification disputes. They also, as discussed, create uncertainty in plea negotiations and invite related litigation on that front as well. The overall

---

[40] *United States v. W.R. Grace*, 526 F.3d 499, 505 (9th Cir. 2008) (en banc).

[41] *Id.* at 506 (emphasis added).

[42] *See* 5 U.S.C. § 3347(b); *cf. SW General*, 580 U.S. at 294–96 (FVRA enacted to halt executive end-runs).

[43] *See* 18 U.S.C. § 3161.

effect is that the Court's criminal dockets slow to a crawl—an entirely predictable (yet avoidable) result when one party to an adversarial proceeding seemingly lacks any power or authority to participate.

### E.    The "de facto officer" doctrine is not a panacea

The government may invoke the de-facto-officer doctrine was a way to minimize disruption and ratify past actions. That doctrine confers validity on an official's acts even if their appointment is later found deficient.[44] But the Supreme Court limits that doctrine and requires merits adjudication—and real remedies—where a timely challenge is raised.[45] And the NLRB cases confirm that courts do not treat appointment defects as harmless formalities; they invalidate whole swaths of decisions and require do-overs when the structural preconditions aren't met.[46]

And even setting all of that aside, a "de facto officer" cannot authorize a non-officer to sit in the grand-jury room under Rule 6(d), administer Rule 6(e) secrecy, sign indictments under Rule 7(c)(1); or personally certify § 3731

---

[44] *Ryder v. United States*, 515 U.S. 177, 180 (1995).

[45] *Id.* at 182–88 (1995) (refusing to apply de facto officer doctrine to validate actions taken by civilian judges appointed to Coast Guard Court of Military Review in violation of appointments clause given accused's timely constitutional objection).

[46] *See, e.g., See Noel Canning*, 573 U.S. 513; *see also* New *Process Steel*, 560 U.S. at 687–88.

appeals,[47] so the de facto officer doctrine does nothing to solve the grand jury problems caused by an unlawfully appointed U.S. Attorney.

## Conclusion

In conclusion, the rules that matter are the rules about who gets to speak for the United States. Congress wrote them with two keys and a clock: permanence by PAS under § 541; a short, 120-day bridge under § 546; and no side doors through delegation or title-swapping under the FVRA. When those constraints are ignored, the office is vacant and its "acts" don't carry lawful authority.

Lawful authority matters for U.S. Attorneys.

It matters because an unlawfully installed U.S. Attorney flouts the law and the Founding-era principles that govern who may speak for the United States. It matters because a U.S. Attorney who is unlawfully inaugurated cannot credibly seek "justice" and meanwhile degrades prosecutorial integrity and public trust, implicating the larger justice system in the process. And it matters because the predictable fallout is daily and district-wide: grand-jury work, plea agreements, and certain government appeals are all compromised by an unlawful U.S. Attorney.

The remedy should fit the wrong. The Court should dismiss the indictment issued under extra-statutory authority—or at minimum

---

[47] *See* 5 U.S.C. § 3348(d)(1)–(2) (acts performing the functions or duties of a vacant PAS office outside FVRA compliance "shall have no force or effect" and "may not be ratified").

disqualify the unlawfully installed U.S. Attorney and anyone acting at her direction and restore the Constitutional order.

Dated: September 2, 2025

Respectfully submitted,

By: */s/ Layla Medina*
LAYLA MEDINA
*Attorney for Amicus Curiae NACJ*